COLUMBIA UNION NATIONAL BANK
and TRUST COMPANY, Co-Trustee and
Sole Executor of the Estate of Henry A.
Bundschu, Deceased, Plaintiff,

v.

Albert J. BUNDSCHU, Pauline B. Brady,
Charles C. Bundschu, Jr., William B.
Bundschu, Ellen Whitman Lancaster,
Leslie Ransom, Billie Jean Childers,
Charles C. Childers, Martin Kent Child-
ers, John Tilson, Charles W. Brady,
Anna Brady Sakurai, Louise Brady Col-
lins, and Bundschu Estate Company
(Referred to as the Bundschu Heirs),
Defendants,

Thomas J. Alexander, Defendant,

William B. Bundschu,
Defendant-Appellant,

James A. Tilson, Defendant-Appellant,

Rockhurst College,
Defendant-Respondent,

Avila College, College of St. Theresa of
Kansas City, Missouri,
Defendant-Respondent,

The Catholic Diocese of Kansas City-St.
Joseph, the Reverend John J. Sullivan,
D.D., Bishop of Kansas City-St. Joseph
and John Schmeideler, Superintendent
of Schools, The Catholic Diocese of
Kansas City-St. Joseph, Defendants-Re-
spondents,

Robert Ishmael, Robert V. Burgess, Donna
M. Burgess, Donald V. Underwood, Ber-
nard J. Paprocki and Beverly Paprocki
(Referred to as the Ishmael Group), De-
fendants-Respondents,

John D. Ashcroft, Missouri Attorney
General, Defendant.

No. WD 32992.

**866**

William B. Bundschu, pro se.

William D. Cosgrove, Kansas City, for Tilson.

James Tierney, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, for Catholic Diocese of K.C.-St. Joe., Rev. Sullivan and John Schmeideler.

Norman P. Gordon, Thomas Lasley, Gordon & Gordon, Kansas City, for Avila College.

Richard W. Miller, Kevin E. Glynn, Weldon H. Fannen, Miller & Glynn, Kansas City, for Rockhurst College.

C. John Forge, Independence, for Robert Ishmael, et al.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The appeal is from a judgment of the probate court to approve a compromise settlement among the beneficiaries of a trust in disagreement as to the construction of the trust provisions entered under §§ 473.-084 and 473.085 [Laws of 1980 effective January 1, 1981]. The successor cotrustee James A. Tilson and heir William B. Bundschu alone contest the judicial sanction of the settlement. The cotrustee contends that the continuation of the trust as constituted remains necessary to carry out a material purpose of the trustor and that the termination of the trust by agreement and decree thwarts that manifest intention. The heir Bundschu contends that the trust never became operative, but if it did, the termination of the trust by the settlement agreement was invalid because a material purpose of the trustor remains unaccomplished. The beneficiaries contend the cotrustee and heir Bundschu are not aggrieved by the judgment, do not stand to appeal, and move dismissal of the appeals.

The trust, a component of the will of Henry A. Bundschu, former Bankruptcy Judge, was established by a first codicil executed on January 29, 1976. That instrument set aside the remainder of the residuary estate as a separate fund, designated *The Bundschu Trust* in memory of the parents of the testator. The testator died on May 4, 1978, and the will was admitted to probate together with the first and second codicils as the last testament of Henry A. Bundschu.

In express terms, the Bundschu Trust [Article IV, ¶ B of the first codicil] provides:

"B. The Trustees shall set aside the remainder of my residuary estate as a separate trust, which shall be designated 'The Bundschu Trust' in memory of my parents, Anton J. Bundschu and Anna Ott Bundschu. Such Trust shall be held administered and distributed under the following terms and conditions:

"1. *The Bundschu Trust shall be held and administered for the primary benefit of the St. Mary Catholic Diocesan High School in Independence, Missouri. At the time of writing this First Codicil to my will, a new building to house said high school is under construction.* The provisions contained herein for the benefit of said high school and its students is contingent upon said building being named the 'Bundschu Catholic High School' or some equivilent [sic] name containing the word Bundschu.

"2. If, at the time The Bundschu Trust comes into existence, there is still an outstanding balance due for the construction of the new building housing said high school described in subparagraph 1 above, then the Co-Trustees shall pay off and discharge said debt from the principal of this trust.

"3. Thereafter and during the time The Bundschu Trust shall be in existence, the Co-Trustees shall pay over and distribute any part or all of the net income from the trust estate to the Superintendent of Schools of the Catholic Diocese of Kansas City-St. Joseph, Missouri for the sole purpose of providing scholarships to

students attending said high school. Scholarships shall be awarded on the basis of scholastic achievement and need. The amount of net income to be devoted to such scholarships each year shall be in the sole discretion of the Co-Trustees. Any such net income not used for scholarships in any given year shall be paid over in equal shares to Rockhurst College and Avila College, both of Kansas City, Missouri, to be used for the general operations of said colleges.

"4. During the time The Bundschu Trust shall be in existence the Co-Trustees in their sole discretion may invade the principal of the trust estate for the purpose of paying for capital improvements to the building then used to house the St. Mary Catholic Diocesan High School. Such invasions of principal may be made to the extent of exhausting the trust estate, should that be necessary to [sic] desirable in the sole opinion of the Co-Trustees.

"5. Should the St. Mary Catholic Diocesan High School cease to exist for any reason after the creation of the Bundschu Trust, this trust shall then terminate and the then principal and undistributed income, if any, shall be paid over and distributed in equal shares to Rockhurst College and Avila College, to be used for the general operation of said Colleges.

"6. Should the *new* building housing the St. Mary Catholic Diocesan High School not be named in honor of my family as provided in subparagraph B.1. of this Article within sixty (60) days after the creation of The Bundschu Trust, or should said high school cease to exist prior to my death, the provisions contained herein for the benefit of said high school and its students shall be void. In such event, this trust shall terminate and the Co-Trustees shall pay over and distribute the then principal and accummulated [sic] income of the trust, free from trust, to Rockhurst College and Avila College, both of Kansas City, Missouri. The funds paid over and distributed to said colleges shall be used by each institution in the construction of one or more buildings at said colleges, which are to be dedicated to the memory of my mother, Anna Ott Bundschu." [emphasis added]

The essential trust terms constitute the St. Mary Catholic Diocesan High School as primary beneficiary and designates the benefits to issue if the new building then under construction to house the high school be named *Bundschu Catholic High School* [or some equivalent] within sixty days after the death. In default of that contingency, or if the Diocesan high school cease to exist, then the trust terminates and Rockhurst College and Avila College receive the principal and accumulated income of the fund free from trust. The structure under construction was, within sixty days of the death, named *St. Mary High School Bundschu Memorial Building.* [The parties stipulate the designation was both timely and equivalent within the sense of the codicil.] The benefit to the high school under the trust is the distribution of any or all of the net income from the estate to the Superintendent of Schools of the Catholic Diocese of Kansas City-St. Joseph for scholarships to the school to students on the basis of academic achievement and need. The cotrustees are granted the sole discretion to determine the income for distribution for scholarships and any unused income is directed for payment to Rockhurst College and Avila College. The trust directs also that the cotrustees use the principal to liquidate any outstanding balance due for the construction of the *new* building to house the high school.

In fact [despite the premise of the Bundschu Trust that "[a]t the time of writing this First Codicil to my Will, a new building to house said high school is under construction"] there was not then [January 29, 1976] or even later a new construction for St. Mary Catholic Diocesan High School. Rather, the St. Mary parish grade school, which abutted the high school, was relocated and then renovated as an integer of the diocesan high school.

In short time after the Bundschu death, cotrustees Alexander, Tilson and Columbia Union National Bank conferred with representatives of the Diocese [owner and operator of the St. Mary Catholic High School, Rockhurst College and Avila College], to advise them [as legal advisor to the testator and draftsman of the will] that the intent of the trust as to St. Mary Catholic Diocesan High School was to pay the debt for the renovation or acquisition of the new high school building. The cotrustee Alexander requested also that Rockhurst and Avila consider that the claims of the Diocese for capital improvements to the high school be within the discretion of the trustees to pay. Rockhurst and Avila would consent to neither. Rockhurst and Avila insisted that the *new building under construction* terminology of the Bundschu Trust meant a newly constructed high school building, and not a renovated old grade school acquired for the high school purpose. They contended also that the *Bundschu* designation to a *new* high school structure was a condition to trust benefits for the high school and students, and in default of a *new* high school construction, the trust terminated and resulted in a giftover of the principal and interest to Rockhurst and Avila.

In consequence, the Columbia Union National Bank as sole executor and cotrustee of the Bundschu estate brought a petition for declaratory judgment to construe the trust and for instructions. The petition posed for response [1] whether

(b) Under the first codicil under Paragraph B shall the Bundschu Trust be held and administered for the primary benefit of the St. Mary Catholic Diocesan High School in Independence, Missouri and its students, and, if so,

(i) What is the outstanding balance due for the construction of the new building housing said high school under paragraph B 2 of the First Codicil?

(ii) Does the trustee have complete discretion as to the payment of net income from the Bundschu Trust for scholarships under paragraph B 3 of said codicil? and

(iii) May the trustees exercise their discretion under paragraph B 4 of said codicil to pay for capital improvements to the building used to house the St. Mary Catholic Diocesan High School which were incurred prior to the date the trust existed?

The plaintiff joined as parties defendant cotrustees Alexander and Tilson, the numerous heirs, devisees and legatees under the will, the trust beneficiaries Catholic Diocese of Kansas City-St. Joseph and Bishop John J. Sullivan [nominal owner of the diocesan property]. Rockhurst College and Avila College, the Attorney General of Missouri [to represent the public interest in the charitable student scholarship trust], among others. A class of litigants [the Ishmael Group] comprised of parents of actual and prospective students of the St. Mary Catholic Diocesan High School who moved to intervene on the contention that the Diocese did not adequately represent their interests were also joined as defendants.

The defendants Rockhurst and Avila responded with the earlier contention: that the condition precedent for benefits to the St. Mary Catholic Diocesan High School and students—a newly constructed building— was not met so that the trust terminated and the colleges were entitled to distribution of the entire corpus, principal and interest. They responded also that the criteria for the allocation of scholarships to the students were uncertain and that the provisions for the distribution of the income between the Diocese, on the one hand, and

---

1. The petition requested the additional declaration that the recital in Article II of the Will of the *partnership known as the A.J. Bundschu Company* was a reference to the undivided 130–600th *interest of the decedent to certain* property known as 103 North Main Street in Independence, Missouri. The court construed that provision as requested by the petition. That adjudication bears relevantly only on the issue of heir William B. Bundschu as an aggrieved party—and hence status or not for appeal—and not on any dispute between the Diocese, on the one hand, and Rockhurst and Avila, on the other.

Rockhurst and Avila, on the other, were impractical to administer and so also fraught with controversy.

The defendant Diocese responded that the *new building* reference in the Bundschu Trust was the grade school under renovation for the expanded high school and that, alternatively, if the testator Bundschu believed a new building was in the process of construction, he was mistaken, but a mistake and ambiguity dispelled by the encompassed intent of the testator to constitute the high school primary beneficiary on condition that building go by the Bundschu family name.

The office of the attorney general answered on behalf of the public interest in the charitable trust.

The cotrustee Alexander answered and admitted the allegations of the petition for declaratory judgment of cotrustee Columbia Union National Bank and Trust Company.

The cotrustee Tilson neither joined in the petition or answer of the other cotrustees, but simply made no response to the petition and summons served upon him.

The former intervenor Ishmael Group, now joined as party defendant, answered and requested a declaration as to the construction and validity of the testamentary provisions.

The heir Bundschu, as well as the several legatees and devisees, also made answer. The superintendent of schools of the Catholic Diocese also made answer.

In addition to the several answers, the defendants Diocese, Rockhurst and Avila each pleaded a separate count to allege an accord among them, all the actual or potential beneficiaries of the Bundschu Trust, of

disagreements as to the construction of that instrument and moved the approval of the court and order for distribution of the net assets according to the terms of the Settlement Agreement.[2]

The question on trial to the court was to sanction or to disapprove the settlement agreement. The litigants and the court proceeded on the theory that the validity of the settlement agreement rested on whether the terms conformed to the intent of the trustor. The evidence of the circumstances and dispositions of the testator Bundschu, accordingly, were received primarily to probe for that intent. The evidence was received, secondarily [should the court withhold approval of the agreement], on the other issue posed by the petition and responsive pleadings: the construction of the trust and request of the executor and cotrustee Bank for instructions.

That evidence was that the first intimations of a testamentary disposition to the St. Mary Catholic Diocesan High School arose in late 1974. Father Ward, a childhood friend of the testator and former pastor of St. Mary Parish, paid Bundschu a pastoral visit. The testator disclosed to the pastor an inclination to bequeath a sum for the construction of a new convent for the Sisters of Mercy.[3] Father Ward explained that the existent convent was relatively new and would continue to be adequate for the dwindled convent population. Later that year, during another visit, Bundschu informed Father Ward he would like to have a building named after him in Independence and for his money to remain in that city to assist the education of the children of the area in the Catholic school system. Father Ward assured him that could be accomplished. In the spring of 1975, Father Ward visited again. Bundschu

---

2. The Settlement Agreement document as finally executed was subscribed by the Ishmael Group [a class of parents of actual or potential student beneficiaries of scholarships under the terms of the Bundschu Trust] as well as by the Diocese, Rockhurst and Avila.

3. In fact, the last will and testament already executed by Bundschu [September 14, 1973] provided a trust fund for that exact purpose. It was that provision [Article IV of the will] which the first codicil revoked on January 29, 1976, and which substituted the new Article IV, the *Bundschu Trust.*

asked how to designate the money for the education of the area children, if that became his decision. Father Ward explained that St. Mary Parish, of which he was pastor, was in the process of relocation and construction of a new building for the grade school and that the high school was to move into the vacated grade school building and was to expand into that structure. Father Ward explained further that if Bundschu decided for the grade school, the bequest should be to the pastor of St. Mary Parish, but if Bundschu decided for the high school, the bequest should be to the Bishop with directions that the money be supervised by the Diocesan Superintendent of Schools. Bundschu asked which of the two schools was on harder times, and Father Ward suggested that the high school was beset by more financial impediments because St. Mary Parish enjoyed a broader base. Bundschu gave no inkling that he favored one more than the other, but indicated that his interest in St. Mary, whether the parish or the high school, was due in part to their location in the city of Independence. On the last visit between them, in the fall of 1975, Bundschu told Father Ward: "I'm going to take care of you." Father Ward understood him to mean the Catholic school system in Independence, but the pastor could not say whether the reference was to the grade school or the high school. They discussed the designation of a school building with the Bundschu name. Bundschu made no distinction for that purpose between a new construction or a building already in place. Bundschu asked again how the high school should be described if he decided to make it a beneficiary and Father Ward spelled out to him: St. Mary Diocesan High School. Father Ward had spoken to Bundschu about a new building construction for the grade school, but never mentioned a new structure for the high school.

The cotrustee Alexander also testified. Bundschu consulted with him about a first codicil to the will. Bundschu advised lawyer Alexander that he wished to leave his property not already disposed by specific bequests in the will or inherited from his family to Catholic charities. He wished for his money to be used in Independence, his home city, and was interested that some of the money be used for structures to bear the family name as memorials. Bundschu advised him also that he wished to create a trust for the benefit of the St. Mary school. Alexander was aware that Bundschu had discussed with Father Ward a revised trust for a new beneficiary. When Alexander asked Bundschu the exact name of the high school, Bundschu telephoned Father Ward. The language in the first codicil that the Bundschu Trust shall be held and administered "for the primary benefit of the St. Mary Catholic Diocesan High School" came explicitly from Bundschu. He also specified the "new building to house said high school is under construction" terminology in Article IV of the codicil. Alexander testified Bundschu believed a new high school was under construction. Bundschu told Alexander he wanted a St. Mary Catholic Diocesan High School building given the family name.

There was evidence also that the Roman Catholic Church is a hierarchy of ascendant jurisdictions from the parish [priest] to the diocese [bishop] and ultimately to the Pope. The governor, or Ordinary, of the Diocese at the time of the suit was Bishop John J. Sullivan, joined as a party to the proceedings. The properties of the diocese are held by the Catholic Diocese of Kansas City-St. Joseph, a charitable corporation. The corporation is controlled by the Bishop and serves as the instrument through which the Bishop administers the Diocese.[4] This evidence bears relevantly on the practical administration of a gift given in trust for a high school owned by the Diocese—and therefore a concern of the Bishop. The Diocesan Superintendent of Schools, desig-

4. The settlement agreement tendered to the trial court for approval was subscribed by Bishop Sullivan twice, once as Bishop and Ordinary of the Diocese, and again as Bishop-administrator of the corporation.

nated by the Bundschu Trust to receive the scholarship money for benefit of the students of St. Mary High School, merely exercises an authority delegated by the Bishop. It was the Bishop, also, as head of the Diocese corporation who was vested with authority to—and did—designate a St. Mary Catholic Diocesan High School building with the *Bundschu* name to qualify for the benefaction.

There was other evidence to explain the primacy of the Bishop over the parishes in fiscal matters within the territory of the Diocese. A parish in need of funds to construct a school, for instance, borrows from the Diocese for that purpose. A parish with a surplus of funds, in the same manner, deposits with the Diocese for access by a parish or school in need. Thus, in the mid-1970 decade, when it became evident that St. Mary Catholic Diocesan High School needed more student space but was without the funds for that purpose, the Diocese financed the transaction. It was the decision of the School Board of the Diocese *not* to construct a new high school but to vacate the adjacent parish grade school, relocate that institution in a new structure some distance away, and to expand the high school into the vacated, but renovated grade school structure. The high school was without funds for that purchase, so the Diocese agreed to pay the St. Mary parish $500,000 [about one-half of the market value] for the old grade school and entered that sum as a loan from the Diocese to the high school for repayment. That evidence is relevant—not only to enlighten the conundrum between the *new* [high school] *building under construction* [trust terminology] and the actual fact of a mere renovation—but also to the reasonableness of the agreement that the fund pay the balance of that loan to the Diocese conformably with the intent of the Bundschu Trust [Article IV, B2] as one component of settlement.

There remains one other subject of evidence relevant to the adjudication: the terms of the Settlement Agreement litigated by the parties and adjudicated by the court. That instrument was before the court as an element of the pleadings. We rescript those terms as they become relevant to discussion of the contentions on appeal. In precis a preamble recites that the Diocese for the benefit of the high school, Rockhurst College and Avila College are the sole beneficiaries of the Bundschu Trust, notes the disagreement among them as to construction of Article IV of the testament, and poses the resultant question whether the Trust came into existence and—if so—the proper distributions intended. The terms of agreement accept the premise that Article IV constitutes the St. Mary Catholic Diocesan High School the primary beneficiary of the Bundschu Trust. The terms of agreement then direct that the Executor pay to the Diocese the debt owed by the diocesan high school for the acquisition and renovation of the vacated grade school structure [and counterpart to ¶ 2 of Article IV, B] and equivalent to the proposal tendered by the cotrustees to the beneficiaries Rockhurst and Avila, but refused by them], (2) the payment of part of the cost of capital improvements to the high school [counterpart to ¶ 4 of Article IV, B], (3) the colleges relinquish the claim that the high school cannot be beneficiary [by concession that the *new building* references in the Trust are deemed to mean the high school then under renovation at the execution of the codicil], relinquish claim to a part of the income of the trust, relinquish the remainder interest should the high school cease to exist, (4) in lieu, that each college receive a $400,000 sum outright, subject to modification to the extent the residuary property exceed or be less than $3,000,000, (5) that the balance of the residue be held by the Diocese as trustee for the benefit of the high school and its students to allow also discretionary invasion of the principal to pay for capital improvements at the school.

The trial court answered only one request for instruction[5] and determined that the other request—to construe the Article IV trust, to declare its validity, and to instruct the trustees as to respective rights under those terms—was resolved by the agreement composed among the several beneficiaries of the trust. The court found the Settlement Agreement conformed to the intent of the settlor that the trust be a primary benefit to the high school, found the agreement otherwise fair to the secondary beneficiaries, approved the terms and ordered that they have the efficacy of judgment. The result of the judgment was to terminate the Bundschu Trust and to reconstitute a trust for the benefit of the high school only.

The cotrustees Columbia Union National Bank and Alexander do not appeal. The attorney general does not appeal. The appeals come from William B. Bundschu, a nephew and heir of the decedent, and from cotrustee Tilson. The respondents Diocese, Rockhurst, Avila and Ishmael Group contend that neither heir Bundschu nor cotrustee Tilson is an aggrieved party and move dismissal of the appeals. We agree and enter judgments of dismissal.

 A party to a suit aggrieved by a judgment of a trial court may take an appeal. § 512.020. To be aggrieved, and so stand for appeal, the person must not only be a party but also have an interest in the subject matter of suit. *Freeman v. DeHart*, 303 S.W.2d 217, 221[5, 6] (Mo.App. 1957). In a suit to contest a testamentary disposition, the aggrievement must be a judgment which directly affects a pecuniary interest of the litigant. *In re Estate of Soengen*, 412 S.W.2d 533, 536[2] (Mo.App. 1967). That a judgment adversely affects the interest of another does not suffice to enable a party to the action to impugn a judgment which does not prejudice his own

right. *State ex rel. St. Louis Union Trust Co. v. Sartorius,* 350 Mo. 46, 164 S.W.2d 356, 358[1, 2] (banc 1942). The heir Bundschu pleaded a request that the court interpret the will bequest of "all ... right, title and interest in the partnership known as the A.J. Bundschu Company" to mean the real property at 103 North Main Street in Independence. The court expressly adjudged that relief. The heir Bundschu pleaded also that the court give the affirmative instructions requested by the petition for declaratory judgment by the cotrustee Columbia Union National Bank & Trust Company: that the codicil Article IV, ¶ B creates a valid trust for the primary benefit of the St. Mary Catholic Diocesan High School and its students. That request [we assume for argument it was an interest of the heir] also was adjudicated favorably to Bundschu, albeit not as an instruction to the trustees, but as an indispensible precondition to the approval of the Settlement Agreement.

The aggrievement the heir Bundschu asserts for status to appeal, therefore, does not derive from any of these adjudicated interests, but from a contention that as a "potential beneficiary" his approval was indispensible to a valid Settlement Agreement. The heir Bundschu does not expound nor otherwise relate that argument to §§ 473.084 and 473.085 [Laws 1980, effective January 1, 1981], then extant, and enacted to govern such procedures. That law, modeled on § 3–1101 of the Uniform Probate Code, for the first time defines a method for the compromise by agreement of a testamentary controversy within its scope:

§ 473.084

A compromise of any conroversy as to admission to probate of any instrument offered for probate as the will of a decedent, the construction, validity, or effect of any probated will, the rights or interest in the estate of the decedent of any

---

5. The court adjudicated that the Article II will reference to the "partnership known as the A.J. Bundschu Company" was to the 130–600th interest of the testator in certain described property located on Main Street in Independence, Missouri. There was no contest of that issue, so that the judicial declaration was tantamount to a stipulated judgment.

successor, or the administration of the estate, *if approved in a proceeding in the court for that purpose, is binding on all the parties thereto,* including those unborn, unascertained, or who could not be located. *An approved compromise · is binding even though it may affect a trust or an inalienable interest* . . . .

§ 473.085

The procedure for securing court approval of a compromise is as follows:

(1) The terms of the compromise shall be set forth in *an agreement in writing which shall be executed by all* competent persons and parents acting for any minor child *having beneficial interests or having claims which will or may be affected by the compromise.* Execution is not required by any person whose identity cannot be ascertained or whose whereabouts are unknown and cannot reasonably be ascertained;

(2) Any interested person, including a personal representative or trustee, may then submit the agreement to the court for its approval and for execution by the personal representative, the trustee of every affected testamentary trust, and other fiduciaries and representatives;

(3) After notice to all interested persons or their representatives, including the personal representative of the estate and all affected trustees of trusts, *the court, if it finds that the contest or controversy is in good faith and that the effect of the agreement upon the interests of persons represented by fiduciaries or other representatives is just and reasonable, shall make an order approving the agreement and directing all fiduciaries under its supervision to execute the agreement.* Minor children represented only by their parents may be bound only if their parents join with other competent persons in execution of the compromise. *Upon the making of the order and the execution of the agreement, all further disposition of the estate is in accordance with the terms of the agreement.* [emphasis added]

■ The statute prescribes [§ 473.085(1)] that all persons with beneficial interests or claims affected by the compromise subscribe in a written agreement. The heir Bundschu was not a named beneficiary of the trust. The codicil names the St. Mary Catholic Diocesan High School primary beneficiary of the trust. It provides for distribution of the net income to the diocesan Superintendent of Schools for student scholarships to the high school, and for distribution of the net income not used for that purpose to Rockhurst College and Avila College. It provides also, in the event the conditions for the continuation of the trust are not met, for a gift over to Rockhurst and Avila. The heir Bundschu was not named as a donee of the gift over should the trust terminate. A residuary legatee, heir, or other person has no status to appeal the construction of a testamentary trust where the terms, even if adjudicated in favor of contention, confer no pecuniary benefit on that litigant. *In re Estate of Soengen,* 412 S.W.2d 533, 536[3] (Mo.App. 1967).

■ The heir Bundschu contends, nevertheless, that the codicil to the testament rested on a mistake of fact—that a *new building* was under construction for the high school—and that the attribution of the *Bundschu* name to a *new* high school construction was a precondition to a valid trust. The heir Bundschu argues further that the codicil trust provision, induced by that palpable mistake of fact, is subject to set aside by rescission, so that the corpus reverts to the residuary estate and invests him with an interest to appeal. That argument condemns the fact found by the court: "[T]he Bundschu Trust came into existence, and cannot fail because of Article IV, Paragraph B(6)—[that the school structure be designated by *Bundschu* or equivalent within 60 days after creation of the trust, a condition all stipulate was met]—[so that] the Bundschu heirs are absolutely precluded from taking under the First Codicil and as a result, have no standing to object to [the] Settlement Agreement."

The heir Bundschu misdirects the office of the fact found and misconceives the nature of the adjudication the fact sustains. The judgment rendered in the trial court, and now on appeal, is not a will contest nor a declaratory judgment of the trust provisions, but the approval of *an agreement to compromise a controversy as to the construction of the trust component of a will.* The efficacy of such an agreement does not depend upon what litigation may ultimately determine the words to mean, but only on the written agreement among all persons with a beneficial interest or claim affected by the compromise [§ 473.085(1) ],[6] and the determination of the court that the controversy is in good faith and that the agreement affects fairly the interests of persons represented by fiduciaries or other representatives [§ 473.085(3) ]. The statute intends—rather than to dissipate estate assets by litigation over the construction or effect of a testamentary instrument—a method to settle such a controversy by agreement among the persons who hold the beneficial interests in the estate of the decedent. Uniform Probate Code, Comment to § 3–1102; Averill, Uniform Probate Code in a Nutshell § 24.01; Mo. Bar CLE, Missouri Probate Code 1980, Practice Note, p. 41. The statute goes further: the settlement agreement once approved, the court "shall make an order . . . directing all fiduciaries under its supervision to execute the agreement . . . [and thereupon] all further disposition of the estate is in accordance with the

terms of the agreement." [§ 473.085]. Thus, the compromise once approved, the property devolves according to the terms of agreement, and not of the testamentary instrument. In a word, the judgment on appeal adjudicated a contract, not a will, and the rights the beneficiaries assert on appeal rest on contract and not on a testamentary trust. *In re Ellis,* 228 Mass. 39, 116 N.E. 956 (1917).[7] The efficacy of the consensus among the trust beneficiaries rests not on the validity of the trust as a component of the will, but on the concessions made on one side and accepted on the other as to good faith differences over the construction of the *new building* and scholarship distributions provisions of the trust. If the trust must be construed to mean that Bundschu intended a new building construction for the high school rather than merely a renovation for the designation of the family name, then presumably, the trust for the benefit of the high school and students fails, and Rockhurst and Avila receive as benefactors of a gift over. Otherwise, the trust takes effect and distribution goes to the high school in a commensurately greater amount as primary beneficiary. The trial court found that the Settlement Agreement among all the beneficiaries was a compromise of a good faith dispute and was reasonable to all persons in interest, and approved the composition. That fulfilled the requirement of § 473.085(3).

The contention the heir Bundschu makes to establish an interest in the trust,

6. The Settlement Agreement approved by the trial court conformed to the particular of that statute that the compromise agreement be *executed by all competent persons and parents acting for any minor child having beneficial interests or having claims which will or may be affected by the compromise*—in that the parents of the present and prospective students of the high school [Ishmael Group] were both party to the litigation and signatory [along with the identified beneficiaries, Diocese, Rockhurst and Avila] to the Settlement Agreement.

7. Agreements of the kind contemplated by §§ 473.084 and 473.085 were entirely valid even before those statutes were enacted. Thus, the right of beneficiaries *sui juris* of a testamentary trust to redefine their interests by

their settlement agreement rather than be held to the terms of the will was recognized in *Commerce Trust Company v. Fast,* 396 S.W.2d 683 (Mo.1965). *See also Schoen v. Lange,* 238 S.W.2d 902, 903[1, 2] (Mo.App.1951); *Brinkmeyer v. Helm,* 100 S.W.2d 452, 454[3–7] (Mo. 1936). The new law provides a more defined and confident procedure for that purpose and, as a matter of public policy, settles and binds not only the parties to the compromise agreement but also those in interest "unborn, unascertained, or who could not be located" [§ 473.084] according to a prescribed method of representation and notice. [§ 472.300] *See* Mo. Bar CLE, Missouri Probate Code 1980, Practice Note, p. 41.

and so status to appeal—that the trust provision was a result of mistake [a *new* high school under construction] and so must be set aside by rescission comes too late. The heir Bundschu, rather than impugn the validity of the trust by a timely contest, agreed along with the other heirs and litigants that the trust provisions were valid and acceptable as evidence. The pleadings of the Bundschu heir accede to the validity of the will and the trust component. That subject was never an issue in the trial.[8] The heir Bundschu offered no evidence, examined no witness, but confined participation to pleas and arguments in favor of the validity of the trust and for a construction to favor the high school as primary beneficiary. An heir is without interest in the construction of a testamentary trust—unimpugned as to validity—which merely reorders the distribution of the income and corpus and so impinges on the interests of the beneficiaries and on none of the heir.

■ The heir Bundschu contends finally that the beneficiaries may not agree to terminate a trust where the continuance of the device remains necessary to carry out a material purpose of the trust—therefore, the judgment to approve the Settlement Agreement was erroneous. An heir, of course, is not charged with the protection of the estate. That duty falls on the executor, and in the case of a testamentary trust in proper course, on the trustee. *Webb v. St. Louis County National Bank,* 551 S.W.2d 869, 883[13, 14] (Mo.App.1977); G. Bogert, Trust and Trustees §§ 583, 594 (rev. 2d ed. 1980); Restatement (Second) of Trusts §§ 169 et seq. (1959).

The heir Bundschu is not aggrieved by the judgment to approve the Settlement

Agreement among the beneficiaries of the trust. His appeal is dismissed.

The cotrustee James A. Tilson appeals also. He contends [as did heir Bundschu] that the agreement of the beneficiaries may not terminate a trust where the continuance is necessary to carry out a material purpose still not accomplished. The cotrustee argues, in effect, that to approve the Settlement Agreement as entered threatens the very existence of the trust and aggrieves his official duty and so invests status to appeal. We agree with the statement of principle [*In re Estate of Hill,* 435 S.W.2d 722, 724[4, 5] (Mo.App.1968); Annotation: Trustee's Right to Appeal, 6 A.L.R.2d 152 (1949)] but determine, nevertheless, that the election by the concurrent majority of the cotrustees to forgo appeal binds cotrustee Tilson and leaves him without aggrievement, interest or status for review.

The will constitutes as cotrustees Columbia Union National Bank & Trust Company, Thomas J. Alexander and Albert Bundschu. Alexander was legal adviser to the decedent and draftsman of the will. Tilson, a kin of the decedent, succeeded Bundschu as cotrustee. The three cotrustees consulted with representatives of the Diocese, Rockhurst and Avila soon after the death of Judge Bundschu. The cotrustee Alexander advised what he conceived to be the intent of the testator as to the trust provisions for the St. Mary Catholic Diocese High School and requested, accordingly, that Rockhurst and Avila consent to payment to the Diocese the debt due for the acquisition and renovation of the grade school structure for the high school use. The beneficiaries Rockhurst and Avila adopted the posture that the high school structure was not the

8. In response to the Diocese motion to strike the counterclaim and cross-claim of the Bundschu heirs for lack of interest and status to contest the Bundschu Trust, the Bundschu heirs [appellant among them] did assert the argument the brief asserts—that a trust created by a mistake of fact may be set aside, in which event the corpus may revert and the residuary will pass by intestacy. The invalidity of the trust, however, was never pleaded by the

heirs [or any other party] or otherwise made an issue, but remained merely hypothetical. The heirs, we repeat, offered no evidence, but merely pleaded. Those pleadings—as well as an occasional oral comment—all confirmed the *validity* of the trust. The trial court was never presented with an issue of mistake of fact in the creation of the trust and cannot be impugned now for the first time for a dereliction never committed.

*new building under construction* contemplated in the trust, and refused. The executor and cotrustee Columbia Union National Bank and Trust Company sued in declaratory judgment for instructions. [The responses of the several defendants Rockhurst and Avila and of the intervenor Ishmael Group pleaded the Settlement Agreement upon which issue joined and judgment was rendered.]

The petition for declaratory judgment, curiously, was not a joint suit of the cotrustees, but a request by the cotrustee Bank as solitary plaintiff for instruction as to the construction of the trust—albeit the cotrustees Alexander and Tilson were nominated defendants. The cotrustee Alexander made answer, but the cotrustee Tilson did not. The cotrustees Bank and Alexander fully engaged in the pretrial events and in the contest of the evidence, Tilson did not. The record shows also that at the conclusion of the trial, the cotrustees Bank and Alexander only petitioned for, and were granted, a fee for the service of legal counsel. Tilson, of course, could not and did not. The participation of cotrustee Tilson was to acquiesce in the initiatives of cotrustees Bank and Alexander. The trial stance of the cotrustees Bank and Alexander notwithstanding, they did not appeal the judgment to approve the Settlement Agreement. The beneficiaries Rockhurst, Avila and the Ishmael Group—all signatory proponents of the Settlement Agreement—were not aggrieved by the judgment and took no appeal from the judgment of approval. The Attorney General of Missouri, representative of the public interest in the charitable trust—and so a necessary party to any suit concerning the fund [*Thatcher v. City of St. Louis*, 343 Mo. 597, 122 S.W.2d 915[1] (1938); § 473.085][9] did not appeal. Thus, none of the parties aggrieved are before us on review, nor did the cotrustees Alexander and Bank appeal.

9. The office of attorney general was joined as a party defendant by the petition of cotrustee Bank, made formal answer, moved to strike portions of the separate answers of the respective Bundschu heirs on the ground they lacked interest in the subject of litigation—the trust, were duly notified of the innumerable proceedings in the course of this protracted litigation, participated in discussions to settle the suit, but took no part in the trial. The attorney general appeared only the day *after* trial began, and then only momentarily, since he was engaged in a different trial at the same time in the same courthouse. He explained the tardy appearance by a want of formal notice of the trial date. He acknowledged to the court notice of the trial event from "counsel of one of the parties" but complained that "neither the attorney general nor I as his counsel were shown on the certificate of mailing or certificate of service of that notice." The attorney general thereupon declined to participate in the trial "out of an abundance of caution and with a view towards preserving whatever objections or rights might flow from the failure to give one of the parties notice of the trial." The transcript shows that counsel for the litigants consulted with the attorney general thereafter, without conclusion. The letter of notice of the trial date by other counsel to the attorney general is not in the file nor is any other notice of that event, either from the court or otherwise in the record on appeal. That the attorney general was duly and formally informed of the judgment entered by the trial court and of the heir Bundschu and cotrustee Tilson appeals, appears clearly from the documents in the transcript as well as the signed return receipts for those documents. We can only conclude that the attorney general does not deem that office aggrieved by the judgment to approve the Settlement Agreement—the terms of which were served as a pleading upon his office and then incorporated into the judgment.

That the Bundschu Trust was for a charitable purpose—the advancement of education—is not disputed. See *Voelker v. St. Louis Mercantile Library Ass'n*, 359 S.W.2d 689, 693[3] (Mo. 1962). Since such a fund is a gift for the indefinite public, it devolves upon the attorney general, as charged by statute [§ 27.060] to represent the public interest. The law thus constitutes the attorney general a necessary party to any action for the construction of the instrument of trust. *Thatcher v. City of St. Louis*, 343 Mo. 597, 122 S.W.2d 915[1] (1938); A. Scott, Law of Trusts § 391, p. 3007 (3d ed. 1967). The procedures of equity apart, the provision of § 473.085 that "notice to all interested persons" in the trust issue prior to an adjudication of a compromise settlement of a probate controversy, constitutes the attorney general a necessary party where the subject is a charitable trust. There is simply no appeal by the attorney general, nor motion to us, nor any other formal complaint of any irregularity committed against that party by want of formal notice of suit or otherwise.

The duty of a trustee is defined by the terms of the trust, not illegal, unless otherwise modified by judicial intervention. Restatement (Second) of Trusts § 164 (1959). In the case of a private trust, the powers conferred upon the trustees can properly be exercised only by the concurrence of *all* the cotrustees, unless provided by the terms of the trust. They take the property as joint tenants and exercise the powers of trust as one collective trustee. *Walker v. James,* 337 Mo. 750, 85 S.W.2d 876, 884[2, 3] (1935); Restatement (Second) of Trusts § 194 (1959); G. Bogert, Law of Trusts § 91, p. 237 (Hornbook Series 4th ed. 1963). In a private trust [unless otherwise provided in the instrument of trust] the trustee may not delegate a discretionary duty to a cotrustee and such an exercise will be void as to the trust. *Bales v. Perry,* 51 Mo. 449, 451 (1873); Restatement (Second) of Trusts § 194, comment a (1959). In a charitable trust [unless otherwise provided in the instrument of trust] the powers conferred upon the trustees can be exercised by a concurrence of the *majority* of the cotrustees. Restatement (Second) of Trusts § 383 (1959). That more lenient rule rests on the reality that the usual charitable trust uses numerous trustees and overcomes the practical difficulty of a requirement that all unite in every discretionary act by the device of a majority decision. G. Bogert, Law of Trusts § 91, p. 238 (Hornbook Series 4th ed. 1963).

The provisions of the will confer no dispensation for the cotrustees to act other than as the law prescribes in the case of a charitable trust: through the concurrence of a majority. Article V, which defines the exercise of the trustee power under the will recites only: "My Executors and Trustees shall *have all the powers conferred upon them by law,* and without limiting the same, but in furtherance thereof and in addition thereto, shall have the following powers, *in each case to be exercised from time to time in their sole discretion ....,* etc." Thus, the will does not confer on a sole trustee the right of decision on a trust matter, but confides that exercise of duty to *their sole discretion* that is, the collective judgment prescribed by law for such decisions in a case of charitable trust: that of the concurrence of a majority of them. The cotrustee Tilson was not a protagonist in the litigation. He was joined as a defendant, but made no formal response. He appeared at the trial *pro se,* but took no part. At the trial, the cotrustees Bank and Alexander asserted the validity of the Bundschu Trust and resisted with equal insistence, as contrary to the intent of the settlor, the Settlement Agreement tendered by the beneficiaries. That these postures expressed the active judgment of cotrustees Bank and Alexander [a concurrent majority] is evident throughout. That the cotrustee Tilson, although tacit, was consulted and acquiesced in those positions was made evident from the summation delivered to the court by counsel for the cotrustee Bank:

> Your Honor, I have been authorized to make a very brief statement in summary, and I have conferred with Mr. Tilson, Trustee, and Mr. Alexander, Trustee, and of course my client Columbia Union National Bank ... [a]nd I say that on behalf of all the trustees—Tilson who's here and Alexander who's here and my client, the bank ....

The cotrustee Tilson presumably adopted the course often taken where a number of trustees of diverse skills coadminister a charitable trust: to defer to those with a professional judgment on the particular transaction. *But see* Restatement (Second) of Trusts §§ 171 and 184 (1959); G. Bogert, Law of Trusts § 92, p. 241 (Hornbook Series 4th ed. 1963). To assert interest to appeal, the cotrustee Tilson does not say—nor could he—that the suit efforts by cotrustees Bank and Alexander, even without his active concurrence, were *not valid exercises of the trustee power* under principles of charitable trust. Restatement (Second) of Trusts § 383 (1959); A. Scott, Law of Trusts § 383 (3d ed. 1967). Nor does cotrustee Tilson say that the decision of cotrustees Bank and Alexander not

to appeal from the judgment to approve the Settlement Agreement was not an equally empowered trustee decision. He asserts for himself, rather, a power of decision on behalf of the trust—an aggrievement to appeal—separate and other than that of the concurrent majority cotrustees Bank and Alexander. Where the power to act rests in a majority of the cotrustees [as in a charitable trust], an attempt by one cotrustee to act for the trust is void. *Walker v. James,* 337 Mo. 750, 85 S.W.2d 876, 884[2, 3] (Mo.1935); G. Bogert, Law of Trusts § 91, p. 237 (Hornbook Series, 4th ed. 1963). We do not reach the contention the beneficiaries assert—that the trustees were .without interest or aggrievement to appeal the judgment to approve the Settlement Agreement.[10] We determine only that a concurrent majority of the cotrustees agreed to

10. The beneficiaries contend that the cotrustees represent no interest in the Settlement Agreement which the judgment to approve aggrieves and so do not stand to appeal. They say that all the known beneficiaries are signatory to the agreement—the representatives of the students of the high school and their parents included—and that any unascertained persons in interest to the charitable trust are represented by the attorney general—none of whom object to the judgment by appeal. They argue that the cotrustees are thus bereft of any pecuniary interest in the judgment other than to perpetuate their fees—an insufficient aggrievement for appeal. The cotrustee Tilson argues that the intent of the testator was that independent trustees manage the trust and that they have discretion as to the amount of the accumulated income allocable to the diocesan Superintendent of Schools for scholarships to the students of the St. Mary Catholic Diocesan High School and, to that purpose, specifically designated his legal adviser Alexander, his Bank and his brother Bundschu [succeeded by Tilson, another kin nominated by the will as first successor trustee]. He says that to sanction the Settlement Agreement not only aborts a function still active of the cotrustees but also alters the trustee function from an independent management to that of the Diocese—named trustee under the trust as reconstituted by the Settlement Agreement—all contrary to the intention of the testator Bundschu.

It is a settled principle that the agreement of all the beneficiaries *sui juris* of a trust, private or charitable, will compel termination of the trust notwithstanding objection by the trustees. Restatement (Second) of Trusts § 337 (1959); *State ex rel. Eichorn v. Luten,* 515 S.W.2d 857 (Mo.App.1974); A. Scott, Law of Trusts §§ 337 and 367A (3d ed. 1967). However, "[i]f the continuance of the trust is necessary to carry out a material purpose of the trust, the beneficiaries cannot compel its termination." Restatement (Second) of Trusts § 337(2) (1959); *Tate v. Schoonover,* 462 S.W.2d 792, 793 (Mo. 1971); G. Bogert, Trusts and Trustees § 399, p. 325 (rev. 2d ed. 1977). That the result of agreement among the beneficiaries to terminate the trust results in a loss of fees to the trustee is not a sufficient interest either to object to the composition or as an aggrievement for appeal. *Freeman v. DeHart,* 303 S.W.2d 217, 222 (Mo. App.1957). [One express purpose of compromise of probate settlement §§ 473.084 and 473.085 is to place the initiative to settle probate disputes with those who have the beneficial interest and so to hinder wasteful litigation by a testamentary trustee who seeks to perpetuate the trust—and oppose the settlement agreement—merely to perpetuate fees. *See* Uniform Probate Code, Comment to Section 3–1102] A trust is active—and so not terminable by the agreement of the beneficiaries— where the trustee has a duty to perform in relation to the trust property which calls for an exercise of judgment or discretion. *Webb v. Hayden,* 166 Mo. 39, 65 S.W. 760, 762 (1901); Restatement (Second) of Trusts § 69 (1959). We do not determine whether the trust imposed active duties upon the cotrustees. We note only that the litigants all agree [and the trial court determined as a predicate to approve the Settlement Agreement] that the primary purpose of the Bundschu Trust, other than to endow a school building with the family name, was to benefit the St. Mary Catholic Diocesan High School. The Bundschu Trust, technically terminated under the Settlement Agreement, was nevertheless reconstituted by that same compromise arrangement to establish a trust for the same student beneficiaries, except that the Diocese was designated trustee. The evidence is clear that testator Bundschu was fully aware that, even under the terms of the trust he established that although the funds were payable by the trustees to the Superintendent of Schools of the Diocese, it was the Diocese which was the true recipient of the benefaction. In this respect, the Settlement Agreement does no more than to substitute for the intermediary testamentary trustees, the Diocese for dispensation to the ultimate beneficiaries—the students of the high school. In this respect, as well, the Settlement Agreement colorably carries into effect the original trust intention.

Whatever may be the merits of contention, it is clear nevertheless, that where a trustee is affected by a judgment in his official capacity, he is aggrieved and may appeal. *In re Estate of Hill,* 435 S.W.2d 722, 724[4, 5] (Mo.App. 1968). Where the judgment—as in this case—

forgo appeal from that judgment and that such decision binds cotrustee Tilson.

The cotrustee Bank and cotrustee Tilson move us by separate application for allowance of an attorney fee on appeal. The cotrustee Bank and cotrustee Alexander, as we note, each was granted an attorney fee by the trial court for services in that proceeding. [There was no issue of the propriety of the duplicate fees for the joint, but single, trustee duty to protect the trust.] The cotrustee Tilson was only a passive party, was not formally represented by counsel, and sought no fee for either trustee or legal services. The appeal of the cotrustee Tilson, as we determine, was not an empowered act, but contrary to the majority decision that the trust was not aggrieved by the judgment to approve the Settlement Agreement. The motion of the cotrustee Tilson for legal services on appeal, therefore, may not be sustained.

The cotrustee Bank also seeks a fee for legal services on appeal. The beneficiaries resist that request on the ground that none of the trustees was aggrieved by the trial court judgment and so do not stand to appeal. We have not reached the merits of that contention, and need not now, because whether the cotrustees empowered to act for the trust [in this case the concurrent majority Bank and Alexander] are entitled to a fee on the appeal does not depend upon whether a definitive adjudication on the merits would determine that the cotrustees had an interest in the judgment, and therefore an aggrievement to appeal. That is because the empowered cotrustees *did not* appeal, and so we have no occasion to determine the issue of their aggrievement for that purpose. The empowered cotrustees, however, made decision against appeal only after legal opinion, and it is for that service they seek a fee from the estate. That much is clear from the recitations of the exhibit which accompanies the motion, undisputed

as to verity. The singular posture of the litigants, and particularly the cotrustees, prompts our decision. The cotrustees brought a declaratory judgment action to construe uncertain provisions of the Bundschu Trust and for instructions to administer them. That was a legitimate exercise of the duty of the trustees to protect themselves as well as the trust property. The direction of the equity court binds the trustees who are not aggrieved by instructions which settle that duty, and so do not stand to appeal from such a judgment. *State ex rel. St. Louis Union Trust Co. v. Sartorius,* 350 Mo. 46, 164 S.W.2d 356, 358[1, 2] (banc 1942). The petition of the trustees for instructions was not the issue adjudicated, however, but the judgment was rendered on a Settlement Agreement introduced by the defendant beneficiaries by an affirmative plea. That contention for recovery, then embodied in the judgment, invoked the distinctive procedures of §§ 473.084 and 473.085, then not yet construed by appellate opinion. The terms of that procedure, which in certain instances intend to exclude the testamentary fiduciary as a substantive party [*see* Uniform Probate Code, Comment to § 3–1102], leave reasonable doubt to a testamentary trustee whether where the trust is colorably still active, the beneficiaries may, by their agreement to settle a bona fide dispute as to the construction of the trust provisions, preempt any interest [and duty?] of the trustee to assert that the proposed compromise infracts the intention of the testator—that is, that a material purpose of the trust remains unaccomplished and that the testator meant the testamentary trustees to accomplish it.

The expenses for which the cotrustee Bank seeks recompense is for advice to resolve that very doubt of interest and duty of a trustee under the new statutes. They represent time spent by counsel for the cotrustee Bank in consultation and advisement with cotrustee Alexander as to

threatens the very existence of the trust, the trustee shows a presumptive aggrievement and

right to appeal. Annot., Trustee's Right to Appeal, 6 A.L.R.2d 152 (1949).

the feasibility of appeal; discussions with the office of the attorney general as to the view of that official concerning the sufficiency of the notice of trial as a ground of appeal worthy to pursue, and other kindred matters. The law imposes a duty on the trustees to defend an action which seeks to destroy the trust [*Nelson v. Mercantile Trust Company,* 335 S.W.2d 167, 175[12] (Mo.1960)] and awards an attorney fee in the effort to preserve the trust [*Mercantile Trust v. Muckerman,* 377 S.W.2d 355, 360[3] (Mo.1964)] where the terms of trust are ambiguous. The doubt the trustee confronted was not the ambiguity of the trust provisions—for that was the very purpose of the original trustee declaratory action for instructions—but whether the new statutes mean to sanction a settlement of a disputed trust by agreement of the beneficiaries where there remains an active purpose for the trustees yet to accomplish. In such circumstances, a judgment to approve a Settlement Agreement, we conclude, colorably threatens the very purpose of the trust and aggrieves the trustee for appeal. Annot., Trustee's Right to Appeal, 6 A.L. R.2d 152 (1949); *In re Estate of Hill,* 435 S.W.2d 722, 724[4, 5] (Mo.App.1968). The calculus of services the cotrustee Bank recites, however, amalgamates expenses incurred for the amendment of the judgment and other extra-appeal purposes—none of which bear on the decision to appeal or not. That recapitulation includes as well a two-hour appearance before the court of appeals on the day of argument. The cotrustee Bank after advice and information decided against appeal. The appearance on the day of argument therefore was gratuitous and not a proper service for compensation from the estate. The motion is to allow the expenditure of 17.3 hours at $75 per hour and $120.57 in addition for expenses. The expenses are not differentiated. The delineation of services the cotrustee appends to the motion describes 9 hours attributable to an assessment of position for appeal. Accordingly we allow the cotrustee Bank as the representative of the majority cotrustees $675 additional attorney fee on appeal, and make no allowance for expenses not explained.

The appeals of the heir Bundschu and the cotrustee Tilson are dismissed.

The motion for attorney fee on appeal by cotrustee Tilson is denied. The motion for attorney fee on appeal by cotrustee Bank is approved in the sum of $675.

All concur.